S01Q0568. JONES et al. v. NORDICTRACK, INC. et al.
(550 SE2d 101)

HINES, Justice.

This case is before the Court on a certified question from the United States Court of Appeals for the Eleventh Circuit.[1] *Jones v. NordicTrack, Inc.*, 236 F3d 658 (11th Cir. 2000). The question certified is:

Must a product be in use[2] at the time of injury for a defendant to be held liable for defective design under theories of strict liability, negligence, or failure to warn?[3]

The answer is that in a products liability action for defective design the focus is not on use of the product. Under Georgia law, the proper analysis in a design defect case is to balance the risks inherent in a product design against the utility of the product so designed. *Banks*

---

[1] 1983 Ga. Const., Art. VI, Sec. VI, Par. IV; OCGA § 15-2-9.

[2] The question does not define "use," and it is unneccessary for this Court to attempt to define the term for the purpose of this opinion. The rulings of the United States District Court for the Northern District of Georgia giving rise to the certification by the United States Court of Appeals for the Eleventh Circuit were premised on the finding that the product in question was not in "use" at the time of injury. The correctness of that finding is not at issue.

[3] Under this question, we limit consideration of liability for "failure to warn" as a theory of defective design. See *Chrysler Corp. v. Batten*, 264 Ga. 723, 724 (1) (450 SE2d 208) (1994).

*v. ICI Americas*, 264 Ga. 732 (450 SE2d 671) (1994).

## BACKGROUND

The Eleventh Circuit's question arises from a products liability action brought by Laura Jeanne Jones and her husband, William Leonard Jones, against manufacturer NordicTrack, Inc. and seller NordicTrack Fitness at Home ("NordicTrack") in the United States District Court for the Northern District of Georgia.[4] In May 1995, Mr. Jones purchased a NordicTrack Ski Exerciser "Achiever," and the Joneses placed it in their recreation room. The machine had approximately one-inch square chrome front legs projecting straight up, which allowed the elevation of the machine to be adjusted to create the effect of skiing uphill. On July 3, 1996, Ms. Jones was walking through the recreation room when she fell against the ski exerciser. A blunt chrome leg penetrated into the rear of Ms. Jones's right thigh and buttock, severing two veins in her thigh and damaging an artery and a nerve in her leg. The Joneses sued on grounds of strict liability, negligence, and failure to warn, and for damages for loss of consortium.

NordicTrack moved for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12 (c), contending that use of a product is a predicate to liability under Georgia law, and consequently, that NordicTrack is not liable for Ms. Jones's injuries because she was not using the ski exerciser when she was injured. The Joneses responded that the foreseeable risk presented by the exposed metal legs outweighs the utility or the benefit of the product as designed. The District Court granted NordicTrack's motion for judgment on the pleadings after concluding that under Georgia law, recovery on theories of strict liability, negligence, or failure to warn all require that the injury arise from some use of the product, and that the ski exerciser was not in use at the time of Ms. Jones's fall. The Eleventh Cir-

---

[4] Plaintiffs filed their initial complaint on September 18, 1997, in the State Court of Fulton County. On October 28, 1997, defendants removed the case to the United States District Court for the Northern District of Georgia, alleging jurisdiction over the action pursuant to 28 USC § 1332, and that the action might be removed pursuant to 28 USC § 1441. On January 21, 1998, defendants filed a motion for judgment on the pleadings pursuant to Federal Rule of Civil Procedure 12 (c), which was granted by the District Court on May 8, 1998. On May 18, 1998, plaintiffs filed a motion to alter or amend judgment, to vacate judgment and to reconsider pursuant to Federal Rule of Civil Procedure 59 (e) and Civil Local Rule of Practice for the United States District Court for the Northern District of Georgia 7.2E, and a motion for leave to file a second amended complaint. Plaintiffs filed a motion to set aside the taxing of costs on June 16, 1998. The District Court denied the motions on August 5, 1998. Plaintiffs appealed to the United States Court of Appeals for the Eleventh Circuit, and on December 26, 2000, the United States Court of Appeals for the Eleventh Circuit filed an opinion certifying the question to this Court. The case was docketed in this Court on January 4, 2001, and was orally argued on March 19, 2001.

cuit concluded that although the cases and statutes cited by the District Court could be read in the manner described by the District Court, Georgia law was unclear on the necessity of product use.

## DISCUSSION

Whether "use" of a product is a predicate to liability is controlled by both Georgia statutory and case law. The starting point is Georgia's strict liability provision, OCGA § 51-1-11 (b) (1), which states:

> The manufacturer of any personal property sold as new property directly or through a dealer or any other person shall be liable in tort, irrespective of privity, to any natural person, who may *use, consume, or reasonably be affected* by the property and who suffers injury to his person or property because the property when sold by the manufacturer was not merchantable and reasonably suited to the use intended, and its condition when sold is the proximate cause of the injury sustained.

(Emphasis supplied.) The plain language of the statute extends manufacturer liability not only to those who may use the property, but also to those persons who may "consume" the property or "reasonably be affected" by it. See *Mansfield v. Pannell,* 261 Ga. 243, 244 (404 SE2d 104) (1991); *Diefenderfer v. Pierce,* 260 Ga. 426 (396 SE2d 227) (1990). The fact that the statute also states that a manufacturer is liable when the property is "not merchantable and reasonably suited to the use intended" does not set forth a requirement of product use, for such language merely means that the plaintiff must show that the product is defective. *Stiltjes v. Ridco Exterminating Co.,* 256 Ga. 255, 256 (1) (347 SE2d 568) (1986); *Center Chemical Co. v. Parzini,* 234 Ga. 868, 869 (2) (218 SE2d 580) (1975).

This Court's adoption of the risk-utility analysis in *Banks v. ICI Americas,* supra, affirms that a product need not be "in use" for a manufacturer to be held liable in negligence or strict liability for injuries proximately caused by the product.[5] The very facts of *Banks* illustrate the difficulty in defining "use" in the context of injury proximately caused by an alleged defective product, and therefore, the fallacy of the need for a finding of "use" as a predicate to liability.[6] In

---

[5] This Court has recognized that there is no significant distinction between negligence and strict liability for purposes of the risk-utility analysis. *Ogletree v. Navistar Intl. Transp. Corp.,* 269 Ga. 443, 445 (500 SE2d 570) (1998).

[6] Similarly, *Rose v. Figgie Intl.,* 229 Ga. App. 848 (495 SE2d 77) (1997), although involving a product defective because of its manufacture, illustrates the difficulty of an analysis premised on product use. There the plaintiff was allegedly injured after the nozzle assembly

that case, a nine-year-old boy died after ingesting a rodenticide which he found stored in a cabinet in an unmarked container at a boy's club serviced by a pest control company. Id. at 732. The boy's parents and administrator of his estate sued, inter alia, the manufacturer of the rodenticide under theories of negligence and strict liability for defective design, and that the product was inadequately labeled. This Court determined that the plaintiffs were entitled to a new trial on their claim that the rodenticide was defectively designed.[7] Id. at 737 (2). Yet, the product was certainly not in use, in any manner, as a rodenticide, and any attempt to characterize the boy's ingestion of poison as a type of "use," i.e., misuse, unintended use, or abnormal use of the product is wholly unnecessary.

The "heart" of a design defect case is the reasonableness of selecting from among alternative product designs and adopting the safest feasible one. *Banks v. ICI Americas*, supra at 736 (1). Consequently, the appropriate analysis does not depend on the use of the product,[8] as that may be narrowly or broadly defined, but rather includes the consideration of whether the defendant failed to adopt a reasonable alternative design which would have reduced the foreseeable risks of harm presented by the product.[9] Id.; see the Restatement (Third) of Torts: Products Liability, § 2. See also *Ogletree v. Navistar Intl. Transp. Corp.*, 269 Ga. 443, 445 (500 SE2d 570) (1998). Accordingly, the certified question must be answered in the negative.

*Question answered. All the Justices concur.*

FLETCHER, Chief Justice, concurring.

I concur with the majority's conclusion that "use", at least insofar as the word "use" means actually operating the allegedly defective product, is not a predicate to liability under Georgia law. I write separately because finding that "use" is not a predicate to liability for a defectively designed product does not mean that a plaintiff in a defective design case, who has presented a reasonable, safer, alterna-

---

[7] The Court of Appeals' holding that the plaintiffs' claim of inadequate or inaccurate labeling was preempted by federal law was affirmed.

[8] The District Court cited *Hatch v. Ford Motor Co.*, 163 Cal. App. 2d 393 (329 P2d 605) (1958), as factually similar, and consequently, its analysis applicable. In that case, a child was injured when he walked into a parked car. The court concluded that the automobile manufacturer did not owe a duty to manufacture an automobile with which it was safe to collide, but rather to "make it safe for the use for which it is intended." Id. at 397. However, even though *Hatch* was cited in *Long Mfg. &c. v. Grady Tractor Co.*, 140 Ga. App. 320, 321 (1) (231 SE2d 105) (1976), it was relied upon for a different proposition, and the *Hatch* approach has not been utilized for resolution of what is at issue in this certified question.

of a fire extinguisher, which was merely stored, spontaneously exploded and separated from the canister, causing a cloud of chemicals to disperse in the plaintiff's apartment. Id.

[9] As previously noted, the question couches the relationship between "use" and "failure to warn" in terms of a claim of defective design. So, the focus remains on the foreseeability of the risk of harm or the danger involved.

tive design, automatically is entitled to a jury trial. Georgia law does not require, and the Court is not adopting a rule today, that manufacturers of products must always undergo a jury trial before being absolved of liability for alleged design defects. A person is not entitled to a jury trial just because she trips and falls on a chair, coffee table, or other household item and sustains a severe injury. Manufacturers do not need to make all household products rounded, plastic, and padded.

As this Court has stated, adoption of the risk/utility test in *Banks v. ICI Americas*[10] "does not mean that adjudication as a matter of law is no longer appropriate in any case in which a design defect is alleged."[11] Georgia law does not require manufacturers to ensure that the designs of their products are incapable of producing injury.[12] When a plaintiff falls onto a product that was not being operated, did not cause the plaintiff's fall, and had no role other than being the object upon which the plaintiff landed, then the trial court should consider strongly whether summary judgment is appropriate. Manufacturers should not have to ensure, as part of the risks that they must foresee in choosing a design, that their products are safe from persons who collide by happenstance with their products. Otherwise, all manufacturers of products intended for use in the home, from tables to lamps to chairs to exercise machines, will be faced with a jury trial every time someone trips and lands on those items.

Finally, even though "use" is not a prerequisite to liability, "use", whether defined narrowly to mean actual operation or more broadly to encompass the ways in which the product could be utilized, may still be considered in balancing the risk versus the utility of the allegedly defective design.[13] For instance, whether the exercise machine was being operated versus sitting dormant in the recreational room versus stored away in the attic may affect how the risk of the allegedly defective design balances against the utility of that design. Likewise, use remains a part of determining whether a product was merchantable and reasonably suited for its intended uses at the time of sale.[14]

DECIDED JULY 16, 2001.

---

[10] 264 Ga. 732 (450 SE2d 671) (1994).
[11] *Ogletree v. Navistar Int'l Transp. Corp.*, 271 Ga. 644, 646 (522 SE2d 467) (1999).
[12] See *Banks*, 264 Ga. at 737.
[13] *Banks v. ICI Americas*, 264 Ga. 732, 736 n. 6 (listing non-exhaustive list of factors, including usefulness of product, gravity and severity of danger posed by design, likelihood of that danger, avoidability of danger).
[14] See OCGA § 51-1-11 (b) (1).

*Doffermyre, Shields, Canfield, Knowles & Devine, Foy R. Devine,* for appellants.

*Robins, Kaplan, Miller & Ciresi, Daniel A. Ragland, Timothy Pramas, Patricia Yoedicke,* for appellees.